IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:18-cv-80332-BB

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH PA, as subrogee,

    Plaintiff,

vs.

SPX Flow US, LLC, a Delaware
Limited Liability Company,

    Defendant.
_____/

**PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES
AND MEMORANDUM OF LAW**

    Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, ("National Union"), by and through undersigned counsel, and pursuant to the applicable Federal Rules of Civil Procedure, hereby files its Daubert Motion to Exclude or Limit the Testimony of Defendant's expert witnesses, Dr. David Pope ("Pope") and Mr. Ron Parsons ("Parsons"), pursuant to <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) and its progeny. In support thereof, National Union states as follows:

**BACKGROUND**

    At all times, Lena Aquilla has owned the motor yacht Belissimo ("vessel"), a 2002 44 ft recreational vessel manufactured by Hinckley, Model Talaria 44. <u>Bill of Sale</u>, Exhibit "A". The vessel was insured for property damage by National Union. In April of 2015 a new raw water impeller pump manufactured and sold by Defendant was installed on vessel's starboard engine as part of routine maintenance.

On July 28, 2016, while travelling to the Peace River through Charlotte Harbor, the vessel suffered an overheat that resulted in a fire. The vessel was taken to the place where the raw water impeller pump had been installed. At various times, joint inspections were held by all concerned to determine what caused the overheat and subsequent fire.

Installed inside of the raw water impeller pump is an impeller. The impeller consists of a bronze hub to which rubber is injected to create the part, exemplar of which is Photo 1.




Photo 1                                                  Photo 2

When the cover plate to the raw water impeller pump was removed, it was found that all blades[1] had broken off.  See Photo 2.

When working properly, the blades rotate and suction water into the pump, which then travels through a heat exchanger and thereby cools the engine's closed cooling water system. As sea water from the raw water impeller pump passes through the heat exchanger, that water is heated and thereafter expelled from the vessel. When the blades broke off from the impeller the water pumping stopped creating the overheat situation that lead to the fire and engine room damage.

National Union maintains that the blades broke from the impeller hub as a result of a manufacturing defect and predicates, in part, its cause of action pursuant to Section 402A of the Restatement of Torts. In this regard, National Union "need not even prove a specific defect; [it] may

---

[1] The parties use the word "blades" or "vanes" interchangeably.

discharge [its] burden by showing an unexplained occurrence and eliminating all reasonable explanations for the occurrence other than the existence of a defect." <u>Ocean Barge Transp. Co. v. Hess Oil Virgin Islands Corp.</u>, 726 F.2d 121, 124 (3d Cir. 1984).

      Defendant maintains that the intake water grill on the side of the hull was obstructed by something, such as a plastic bag, which impeded the flow of water and thereby the pump ran dry causing the impeller blades to break. In the summary to his report, Dr. David Pope ("Pope") concludes that "to a reasonable degree of engineering certainty that the starboard pump ran dry." <u>Exhibit "B"</u>, <u>Dr. Pope Report</u>, p. 3. At deposition Pope affirmed that his opinion was that there was an absence of water going into the impeller. <u>Transcript of Deposition of David Pope</u> ("<u>Pope</u>"), p. 83.

      In addition, Defendant states that Hinckley, the vessel manufacturer, never connected the raw water flow alarm sensor to the alarm buzzer system. What was connected was the closed cooling system's temperature alarm sensor. Defendant maintains that had the raw water flow alarm sensor been connected, the engines and the engine compartment would have suffered little damage, if any.

      When Lena Aquilla purchased the vessel the raw water flow alarm sensor had not been connected by Hinckley. Defendant asserts that Lena and her husband, Tom Aquilla, failed to exercise reasonable care and diligence in not finding out that the raw water flow alarm sensor was not connected by failing to test the unconnected alarm and by not subsequently connecting it.

      Mr. Ron Parsons ("Parsons") explained how the raw water cooling system alarm works:

> Q. What, to your knowledge, has to occur for this sensor to be triggered and the alarm go off?

A. Water flow needs to be reduced and at a pre-set parameter by Yanmar. The reduced water flow will put the system in motion to trigger two things; one, an audible alarm; and two, a visual alert on the dash[2] which indicates the system that has failed.

Q. What is the pre-set parameter that Yanmar set?

A. Yanmar states that when water flow is reduced sufficiently, that engine damage can occur. The alarm will alert.

Q. And by reduced sufficiently, is there any way to measure that?

A. I'm sure Yanmar has specific numbers to document that information, but their manual for the sensor just uses the term "when water flow is reduced."

Q. Did you try to find out what number Yanmar had?

A. No.

Q. Do you know what is the minimum amount of water that has to go through that so that the alarm doesn't sound?

A. No, I do not know the minimum. All I know is when there was no flow, that alarm will sound.

<u>Transcript of Deposition of Ron Parsons</u> ("<u>Parsons</u>"), at 23-24.

In the conclusion section of Parsons Report, he states that he will offer certain opinions. Only the objected to opinions are set forth:

Based on the analysis of the vessel and component inspections, and inspections of the evidence associated with this loss, it has been determined that an engine failure did occur to the starboard engine for multiple reasons.

The mechanical failure was due to lack of raw water flow. The raw water flow was interrupted in a sudden and isolated event which impeded all water flow through the raw water system. As a result of the lack of raw water in the sea water side of the cooling system, the engine failed. The factory installed safeties, to prevent this exact problem, were not hooked up by Hinckley. Additionally, the operator of the vessel

---

[2]Purchase of a dash with the warning light is optional. <u>Parsons</u>, at 32-33. This vessel did not contain that option as "Hinkley did not install the Yanmar dash. They built their own instrument monitoring system." <u>Id</u>. at 34.

failed to test the alarms in his vessel. Had the alarms been hooked up, and tested by the vessel owner and operator, then there would be no damage whatsoever in the machinery room.

The raw water pump impeller, installed on the starboard side engine, failed as a result of lack of sea water. The failure is consistent with lack of sea water and is not consistent with a manufacturing defect as alleged by the plaintiffs.

Parsons, Exhibit 1, page 138.

## Daubert Legal Standard

In United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004), the court defined the responsibility of the trial court when making a determination on the admissibility of expert testimony:

> Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*See also* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). "*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." United States v. Masferrer, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). "[T]he proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." Masferrer, 367 F. Supp. 2d at 1372.

As set forth infra, National Union respectfully submits that Pope's and Parsons' opinions fail this inquiry. Both intend to offer opinions that are: 1) unreliable, speculative and not

based on any scientific methodology; and 2) these opinions are unhelpful to the trier of fact. Accordingly, National Union respectfully requests that this Honorable Court exclude Pope's and Parsons' testimony and preclude them from offering these opinions at trial.

### Dr. David Pope

Pope's opinions are excludable as they fail to either utilize a reliable methodology or to properly apply a reliable methodology. Expert testimony cannot be based on speculation. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993); Allison v. McGhan Medical Corp., 184 F.3d 1300, 1316-1317 (11th Cir. 1999) ("... a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation...."). A district court must distinguish expert opinions "based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 643 (8th Cir. 2009). An expert may not merely rely on their training or experience to justify their opinions. See Masferrer, 367 F.Supp.2d at 1372 ("[E]xperience, standing alone, is [not] a sufficient foundation rendering reliable any conceivable opinion the expert may express"); Algarin v. Dep't of Corr., 460 F.Supp.2d 469, 477 (S.D.N.Y. 2006) ("An anecdotal account of one expert's experience, however extensive or impressive . . . does not by itself equate to a methodology....")(quoting Berk v. St. Vincent's Hosp. and Med. Ctr., 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005)). Rather, FRE 702 requires that expert testimony be "the product of reliable principles and methods." The requirement of a reliable methodology is separate and distinct from the qualification requirement. United States v. Frazier, 387 F.3d 1244, 1261, (11th Cir. 2004)("If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.")

The process to manufacture an impeller is as follows:

> The metallic hub of the impeller is cleaned and then coated with a bonding agent, and that bonding agent is then cured for a specific amount of time, and then that bonding agent is sprayed with two coats of another intermediate material and allowed to cure for a specific time, and then the rubber material which has been premixed and held at a specific temperature is cast around the hub.

Pope, at 70-71. In preparation to analyze the cause of the breaking of the impeller blades, Pope prepared an inspection protocol. He testified that what was needed to find out if there was a fatigue failure in the impeller vanes was contained in the protocol that he authored. Id. at 27. His purpose was to "examine the impeller and the pieces of the impeller using techniques described in the protocol." *Id*. at 54. In part, the Protocol stated:

> The examination will involve the following equipment and personnel:
> 1. A stereo microscope with photographic capability
> 2. An operator of the microscope - for photography
> 3. A scanning electron microscope (SEM)
> 4. An SEM operator
>
> **Examination of the Port Pump Impeller and Housing**
> This impeller will be examined and photographed both macroscopically and microscopically (in a stereo microscope).
>
> **Examination of the Starboard Pump Impeller and Housing**
>
> 1. The fracture surfaces on the impeller hub will be examined and photographed, both macroscopically and microscopically (in a stereo microscope).
>
> 2. The individual pieces of vanes from the impeller will be examined and photographed, both macroscopically and microscopically (in a stereo microscope).
>
> 3. The individual pieces of vanes from the impeller will be reassembled and photographed.
>
> 4. Some of the vanes will be examined and photographed in a scanning electron microscope. Chemical analysis of the surface residues may be performed using energy dispersive spectroscopy (EDS) in the SEM.
>
> 5. Some fracture surfaces on the hub and on some of the vanes may require cleaning in order to image the details of the fracture surfaces. This cleaning will be performed using a detergent solution in water and an ultrasonic cleaner. If this cleaning is insufficient to remove the lime from the fracture surfaces then "Scotch Tape" will be

used to remove the residue from one of the fracture surfaces. If this is not successful the surface will be ultrasonically cleaned using a dilute solution of acetic acidic acid in water.

6. The fracture surfaces of the cleaned samples will then be examined and photographed in the stereo microscope and in the SEM.

7. The pump housing will be examined and photographed, both macroscopically and microscopically (in a stereo microscope).

8. Samples of the housing may also be examined, photographed and chemically analyzed via EDS in the SEM.

*Id*. at Exhibit 9.

However, Pope failed to use all of the above techniques. *Id*. at 54. Pope failed to use the scanning electron microscope, which is used to perform EDS analysis. *Id*. In this regard:

EDS analysis is an analytical tool used most commonly in a scanning electron microscope in which the sample is bombarded with electrons, and then the sample produces x-rays which are then analyzed within the microscope, and the x-rays provide information about the kinds of atoms contained within the sample.

*Id*. at 51-52.

Pope failed to perform a particle analysis on the surfaces of the impeller vanes, he failed to use the diluted solution of acetic acidic acid in water to remove residues from the surfaces, he failed to reassemble and photograph the pieces of the vanes, he did not examine and photograph in a scanning electron microscope, he performed no chemical analysis, he did not examine the samples of the pump housing and analyze them via EDS or SEM, scanning electron microscope, and he did nothing with the scanning electron microscope. *Id*. at 57-58.

On the tips of the broken vanes, using a stereo microscope, Pope saw evidence of "flow", or the displacement of material on the surface. He theorized that this was the result of heat and friction. *Id*. at 41-42. He looked at literature and found out that the thermal properties of unreinforced EPDM rubber had a maximum service temperature of between 150° to 177° Celsius

(302° to 350.6° Fahrenheit). According to Pope, "unreinforced" EPDM rubber means rubber without an inorganic filler. However, he failed to find out if the blades at issue had an inorganic filler. *Id*. at 51.

According to Pope, "flow" would commence when the rubber on the tips of the vanes was subjected to temperatures of 245° Fahrenheit or above. *Id*. at 62. Yet, he did not inspect other impellers from other pumps to see if they also exhibited "flow". *Id*. at 63. He failed to reconcile how "flow" could commence at temperatures above 245° F. when the maximum service temperature of unreinforced EPDM rubber was from 302° to 350.6° F.

Pope "believed" that the flow condition on the tips of the impeller began when the pump was running out of water. *Id*. at 66. Pope stated that the flow would occur where the tip would be most compressed against pump. However, he tested no impellers to determine this. *Id*. at 64.

Pope downloaded literature from Defendant and saw that the Defendant stated that an impeller pump could not run dry for more than 30 seconds. *Id*. at 65. Pope would not expect to see "flow" within that 30 second time period. However, he never tested that hypothesis. *Id*. He did not try and determine if in that 30 second time period there was a built in safety factor. He "suspect[ed] that there is, but I don't know what it is." *Id*. at 65. He could not tell what would happen at 45 seconds of running dry, "but [suspected] that the tip would show flow very quickly." *Id*. at 65. However, he performed no independent tests to confirm that. *Id*. Unbelievably, he performed no tests to determine whether the impeller tips had heated at all:

> Q. Did you do any chemical tests to confirm that, in fact, the tips had heated up?
> A. No.

*Id*. at 77.

As well, Pope conducted no tests to determine if the EPDM rubber that was on the

impeller had heated at all:

> Q. When EPDM rubber such as the ones that - - the one that was on this impeller hub, when it's heated, does its chemical composition change?
> A. Its chemical configuration changes, yes.
> Q. Did you perform any tests or inspections to find out if that had happened?
> A. No.

*Id*. at 81.  Although he knew that the oxygen content of the rubber could rise when the rubber was heated, he did not test for that either.  *Id*. at 77-78.

Pope acknowledged that "flow" could have occurred before the date in question. He did not try to confirm or discard whether the starboard impeller pump had been run dry before July 28, 2016.[3]

> Q. Do you know if [flow] happened before the date at issue?
> A. It could have happened before the date. But it also had to have happened on the date.
> Q. So it could have happened several times before the date of issue?
> A. It could have.
> Q. Did you ever confirm or discard whether the starboard impeller pump had been run dry before July 28thm 2016?
> A. No.

*Id*. at 66-67.  That Pope could not discard that flow occurred before the date in question requires exclusion of his testimony both for reliability and relevance. Banta Properties, Inc. v. Arch Specialty Ins. Co., 2011 WL 7118542, at *3 (S.D. Fla. 2011)(inability to attribute damage to a specific event).

Pope stated that heated EPDM rubber does not adhere to bronze, the housing of the pump being made of bronze.  *Id*. at 67. However, he did not test the hypothesis that rubber would not transfer to the bronze surface of the pump.  *Id*.

---

[3]Parsons testified that the Vessel was stored on a lift system that would cause it to self-drain [of water] every time she was placed on the lift. This would cause the pump to run dry for more than 20 to 30 seconds. Parsons, at 58-59.  Presumably, according to Pope, there would be rubber "flow" each time the vessel was returned to the water and started.

Pope never found out what was the bonding agent used when the impeller was manufactured. *Id*. at 71. He never tested to determine if the bonding agent had been properly applied nor if it had cured properly. *Id*. at 71-72. He never chemically analyzed nor performed any tests to ensure that the rubber was cast around the hub appropriately at the time of manufacture. *Id*. at 72. He never performed any tests to determine whether the vanes had broken because of improper bonding. *Id*. at 75.

Part of the literature that Pope received from Defendant was a trouble shooting guide. *Id*. at Exhibit 13. This guide gives examples of several problems that can happen with an impeller. Problem 2 is identified as "dry running". The problem that is identified is "End faces hard, polished, cracked, looks like carbon. Some or all vanes completely missing in severe cases." *Id*. at Exhibit 13. However, he made no notation in his report as to the end faces of the impeller hub. *Id*. at 79. The end face is the surface that would be in contact with the cover plate and the other end would be in contact with the opposite end. *Id*. Pope also commented that the illustration on Exhibit 13 showed all of the breaks above the surface of the hub, none were below the surface. *Id*. at 80.

Pope is no stranger to unsupported and speculative opinions. In <u>In Re Fluidmaster, Inc., Water Connector Components Products Liability Litigation</u>, 2017 WL 1196990 (N.D.IL 2017), part of Pope's opinions were excluded as he did not employ any discernable methodology. *Id*. at *27. *Sub judice*, Pope set forth a methodology in his authored Protocol, but then failed to follow it. In essence, Dr. Pope opines that the pump ran dry only because he says so. As found in <u>In Re Fluidmaster</u>, "this *ipse dixit* conclusion is neither helpful nor reliable and will be excluded". *Id.*

## RON PARSONS

**Opinion: An obstruction prevented water from entering the pump**:

Parsons opines that the raw water impeller pump ran dry as a result of an obstruction,

such as a plastic bag, covering the raw water intake grill on the hull of the vessel. This simple proposition is not beyond the understanding of an average lay person and no expert testimony is needed. This testimony will not assist the trier of fact and must be excluded. In this regard, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." United States v. Frazier, 387 F.3d 1244, 1262–63 (11th Cir. 2004).

Even if the Court considers that expert testimony is needed for the proposition that an obstruction on the intake grill will prevent water from entering, Parsons' conclusion remains without foundational support. He states that "it's a fact that the intake was blocked based on physical evidence." Parsons, at 12. When asked what blocked the intake, he replied, "[t]hat, we don't know". *Id*. He then theorizes that "it could have been some type of polymeric material, meaning a plastic bag, that would block the intake". *Id*. He further theorizes that the obstruction would have had to be at least the size of the grill guard. *Id*. at 13.

How and when the obstruction was picked up is speculative. Parsons stated that the Vessel was traveling through the channels, meaning she was at low speed and not planing. He then speculates that "in those speeds and these calmer sea conditions between the islands, that is when this plastic or that obstruction may have been picked up and then retained on the hull when it was brought up on plane." *Id*. at 17.

Parsons used vessel operator Tom Aquila's statement of events to base his opinion as to when the obstruction was allegedly picked up. According to Tom Aquila at 7 a.m. the vessel engines were at 2800 rpms and traveling at 22 knots. *Id*. at 35. Consequently, the vessel was by now outside the canal system. *Id*. at 36. After running 5 to 10 miles, Tom heard the fresh water temperature alarm to the fresh water closed cooling system sound. *Id*. For this alarm to sound, "you

have to exceed a predetermined temperature value of the sensor." *Id*. This value is over 200° F. *Id*.

When Parsons was asked if he had tested the hull guard to see if there were any pieces of plastic stuck to it, he said that he did and that he found no pieces of plastic. *Id*. at 18. All he saw was a collection of barnacles. *Id*.

Even though he developed no facts on which to base his opinion, Parsons concluded that "[t]he raw water flow was interrupted in a sudden and isolated event which impeded all water flow through the raw water system." *Id*. at Exhibit "1", page 138.

This opinion testimony as to the obstruction must be excluded as it is not in the nature of scientific or technical. Alternatively, the opinion is an *ipse dixit* conclusion not based on any sound methodology, but mere speculation.

**Opinion: Vacuum kept the alleged obstruction in place**.

The mechanics of vacuum is beyond understanding of a lay person. However, Parsons testimony lacks a foundation and must be excluded as unreliable.

Parsons opines that what held the alleged obstruction in place was vacuum. *Id*. at 16. Water for the impeller pump comes into the boat through a grill guard that is approximately 2 ½" to 3" by 3 ½", which is located on the starboard rear side bottom of the vessel. *Id*. at 13. The vacuum is ostensibly created by the spinning impellers.

Parsons testified that vacuum can be measured in either inches of water column or inches of mercury. *Id*. at 15. He states that he was unable to measure the vacuum as the system had been disassembled. *Id*. But, then he stated that "you don't measure vacuum." *Id*. Instead, "you measure flow and pressure based on orifice restriction." *Id*. In any event, he never tried to obtain this information from the manufacturer. *Id*. He estimated that the ocean water flowing through the outside of the hull traveled at approximately 22 knots. *Id*. At that speed, the vessel was planing,

meaning that the hull "steps out of the water". *Id*. The vessel would be moving based on sea conditions. *Id*.

He never performed any calculations to determine the interaction between the moving vessel, the length of time the obstruction allegedly existed, and the force of the vacuum on the alleged obstruction. Any opinion testimony by Parsons as to the make up and characteristics of any vacuum created by the rotating impellers and its ability to keep in place any obstruction given the movement of the vessel at high speed over choppy waters is not supported by sufficient facts or data or by the application of reliable principles and methods. Parsons opinion regarding the vacuum and its effect on the obstruction while the vessel was moving is connected to the existing data only by his *ipse dixit*. This testimony must be excluded.

**Opinion: The alleged obstruction caused the raw water impeller pump to run dry and fail.**

Parsons never calculated the length of time that it would take for pump failure to occur assuming an obstruction stating that there were too many variables to try and run a simulated test. *Id*. at 20. Although having plenty of opinions, as to this he had no estimate of how long it would take for the pump to fail after blockage. He stated that such a calculation depended on multiple factors such as engine rpms, speed, whether there was a partial blockage, the material. *Id*. at 21. Such a calculation is necessary for this Court to determine the reliability of the opinion as "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue". Frazier, 387 F. 3rd at 1261-62. This opinion must be excluded. Further, this opinion is duplicative of Pope's.

**Opinion: Boat Manufacturer's Failure to Connect Raw Water Alarm.**

Parsons stated that the two sensors that were not connected by Hinckley to the

Vessel's control panel were 1-the coolant level sensor and 2- the raw water flow alarm sensor. *Id*. at 10. These sensors came with the Yanmar engines. *Id*. at 23.

> Q. Do you intend to offer any opinion as to the design and manufacture of the vessel in 2002?
>
> A. Yes.
>
> Q. And what opinion are going to offer?
>
> A. That the manufacturer should have installed that alarm correctly, and that's probably a poor term. The alarm was already installed in the engine. The manufacturer of the vessel, Hinkley, who put the parts together, did not hook up the wire for the alarm.

*Id*. at 29-30.

The Vessel was built under the standards of the American Boating and Yacht Council ("ABYC"). *Id*. at 27. Parsons reviewed the ABYC standards with respect to the raw water sea flow alarm and ABYC was silent on the subject, i.e. no ABYC standard required this connection. *Id*. at 28. Even the Coast Guard does not specifically require that the raw water sea flow alarm be connected. *Id*. at 29. Even had he testified that industry standards required a raw water sea flow alarm, said testimony is not pertinent as the alleged negligence of Hinckley cannot be used for purposes of comparative negligence as Hinckley is not a party to this litigation. *See* Ebanks v. Great Lakes Dredge and Dock Co., 688 F.2d 716 (11th Cir. 1982), cert. denied, 460 U.S. 1083 (1983). *See also*, Farley v. Magnum Marine Corp., N.V., 1995 WL 795711 (S.D. Fla. 1995); Groff v. Chandris, Inc., 835 F. Supp. 1408 (S.D. Fla. 1993)." Hays v. Foster Wheeler Energy Corp., 2014 WL 12661273, at *2 (S.D. Fla. 2014). Opinion testimony to comparatively reduce any amount awarded to Plaintiff as a result of Hinckley's non-action must be excluded.

**Opinion: Tom Aquilla, Vessel Operator, Failed to test the alarms.**

As liability cannot be apportioned to Hinckley, Parsons tries to shift the blame to Tom

Aquilla:

> The factory installed safeties, to prevent this exact problem, were not hooked up by Hinckley. Additionally, the operator of the vessel failed to test the alarms in his vessel. Had the alarms been hooked up, and tested by the vessel owner and operator, then there would be no damage whatsoever in the machinery room.

*Id*. Exhibit "C", p. 138. However, Tom Aquilla does not own the vessel. The owner is his wife, Lena Aquila. Exhibit "A". The alleged failure of Tom Aquilla "to test the alarms in his vessel" cannot be imputed to Lena Aquilla just because they are married. *See*, Armour v. Gradler, 448 F. Supp. 741, 749 (W.D. Pa. 1978). Like Hinckley, Thomas Aquilla has not been named a party to this litigation. Any opinion testimony that his alleged failure to connect the raw water flow sensor to the alarm for purposes to reduce any damage award to Plaintiff based on principles of comparative negligence must be excluded.

**Opinion: Failure to Have the Raw Water Flow Sensor Caused the Overheating and Subsequent Fire.**

When asked given the speed and water conditions the vessel was at what would have been the length of time between the raw water flow alarm sounding, if connected, and the cooling engine alarm that in fact sounded, Parsons had no answer. *Id*. at 37. He never tried to find this out as "there was way too many input variables to attempt to determine that." *Id*.

> Q. Now, if the sea water raw alarm had been connected --
>
> A. Yes.
>
> Q. -- and the boat had been running at 2800 RPMs, did you ever find out what would have -- what time would have elapsed between the raw water alarm sounding and the cooling engine alarm sounding?
>
> A. The raw water alarm would have sounded first and the coolant alarm would have sounded second.
>
> Q. And what would be the time period between them?

>A. Again, there's variables here; the loading of the engine. There's multiple variables as to that delta or the difference between when the raw water alarm should have sounded and when the coolant temperature alarm did sound.
>
>Q. Did you ever try to make that calculation?
>
>A. No, there was way too many input variables to attempt to determine that.
>
>Q. What input variables would you have looked at if you had wanted to determine that?
>
>A. Water flow through the system. I would have looked at load on the engine, the condition of the engine, the quality of the coolants, the mixing ratio of the coolant, the pumping capacity of the fresh water pump, the heat exchanger on the seawater side to see how corroded or not corroded it was and it's ability to give off heat. There's numerous things to look at.
>
>Q. Did you ever attempt to do that?
>
>A. I looked at these pieces and parts, but there was certainly no reason to test this. As I stated in this chart, had the alarm sounded and the operator and owner of the boat followed the manufacturer, there would be no damage whatsoever to this vessel. None.
>
>Q. My question is: Did you ever attempt to do that?
>
>A. To perform a simulated test? The answer is no.

*Id*. at 36-37.

As with the rest of Parsons' opinions, they are *ipse dixit*. To admit this opinion testimony into evidence requires that the Court take a leap between the data and the *ipse dixit* statement.

WHEREFORE, Plaintiff respectfully requests this Court to excluded those portions of the testimony of Dr. David Pope and of Mr. Ron Parsons that are the subject of the instant Motion.

Pursuant to Local Rule 7.1(a)(3), I hereby certify that undersigned counsel has conferred with counsel for Defendant in a good faith effort to resolve the issues raised in the motion and they have been unable to do so.

*Alvaro L. Mejer*
Alvaro L. Mejer
Fla Bar No. 222623
MEJER LAW, P.A.
Sun Trust Plaza / Suite 504
201 Alhambra Circle
Coral Gables, Florida 33134
Telephone (305) 444-3355
Telefax (305) 442-4300
E-mail: amejer@mejerlaw.com
Alvaromejer@gamil.com
Annie@mejerlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served either by e-mail or via transmission of Notices of Electronic Filing generated by CM/ECF on this 24th day of January 2019 on all the following counsel of record:

W. Mason, Esq.
Fox Rothschild LLP
777 South Flagler Drive
Suite 1700 West Tower
West Palm Beach, FL 33401
Tel: 561-835-9600
e-mail: Wmason@foxrothschild.com

John J. Haggerty, Esq.
Nicholas S. Salter, Esq.
Fox Rothschild LLP
2700 Kelly Road, Suite 300
Warrington, PA 18976
Tel (215)345-7500
jhaggerty@foxrothschild.com
sfineman@foxrothschild.com
Nsalter@foxrothschild.com